**PANDUIT CORP., Plaintiff,**

v.

**BURNDY CORPORATION and Burndy Midwest, Inc., Defendants.**

No. 70 C 2210.

United States District Court,
N. D. Illinois, E. D.

Sept. 11, 1973.

Ronald A. Sandler, Prangley, Dithmar, Vogel, Sandler & Stotland, Chicago, Ill., for plaintiff.

Sidney Neuman, Neuman, Williams, Anderson & Olson, Chicago, Ill., for defendants.

**McGARR, District Judge.**

This is an action for infringement of U.S. Patent No. Re. 26,492, entitled "Binder Strap Tool". The complaint charged Defendants Burndy Midwest, Inc. and J S G Electric Co. with direct infringement of said patent, and charged Defendant Burndy Corporation with actively inducing infringement thereof. J S G Electric Co. was dismissed by stipulation (PX–1, ¶ 6). The Plaintiff seeks an injunction against infringement and damages. The Defendants deny infringement and contend the patent is invalid.

The Plaintiff, Panduit Corp., is a Delaware corporation having its principal place of business at Tinley Park, Illinois, and has the entire right, title and interest in and to U.S. Letters Patent No. Re. 26,492, together with the right to bring and maintain suit for past and future infringement thereof (PX–1, ¶ 1, 2).

The Defendant Burndy Corporation is a New York corporation having its principal place of business in Norwalk, Connecticut. The Defendant Burndy Midwest, Inc. is an Illinois corporation having its principal place of business in Schiller Park, Illinois, and is a wholly-owned subsidiary of the Defendant Burndy Corporation (PX–1, ¶ 3, 4).

This Court has jurisdiction over the parties and the subject matter hereof and venue properly is laid in this district as to the Defendants Burndy Corporation and Burndy Midwest, Inc. (PX–1, ¶ 5, 6).

The Defendants' binder strap tools, Models TY50–1 and TY120–1, are charged by Plaintiff to infringe claims 1 through 5 and 14 through 16 of the Re. 26,492 patent in suit. For the purpose of determining whether such claims are infringed by those tools, both tools can be considered as having the same construction and mode of operation, except that the Defendants' Model TY120–1 does not have a face plate (PX–1, ¶ 9, 10, 11).

The patent in suit is a reissue patent of original Patent 3,169,560, filed March 8, 1962 (PX–1, ¶ 7). The patent is directed to a binder strap tool for applying binder straps about bundles to a substantially uniform predetermined tension and cutting off the tail end of the binder strap when the predetermined tension has been obtained in the binder strap about the bundle (PX–4, col. 1, l. 42 to col. 2, l. 17; R–52 to 66). The bundle typically is a group of insulated wires in an electrical system, such as that of a telephone system, computer, electrical control box, or airplane (PX–6C, 33 to 36; PX–4, col. 1, ll. 46 to 53).

A binder strap or cable tie used with the patented tool is of the "self-clinching" type. A typical strap has a connector on one end through which the other end of the strap is passed. The typical strap has a row of teeth which selectively engage teeth in a locking arrangement in the connector so that only limited retrograde movement of the strap through the connector is possible (R–4, 5, 70; PX–4, col. 2, ll. 41 to 54; PX–6B, PX–6C).

Prior to 1958, string or cord was used to bundle into cables electrical wires used in interconnecting various parts in electrical systems. Such method required a skilled workman and was time consuming. In 1958, The Thomas & Betts Co., then the largest company in this field, introduced plastic self-clinching binder straps for bundling of wires into cables and also introduced a hand tool (the "Logan" tool) for facilitating installation of those straps (PX–39, 56; R–586, 1031 to 1034). An objective of the Logan tool was to install binder straps under equal tension at spaced points along the bundled electrical wires (Logan 3,047,945, col. 1, ll. 23 to 54).

It is necessary that the plastic binder straps be installed at substantially uniform predetermined tension in order to protect the integrity of both the strap and the bundle. If the strap is installed too loosely, it may fall off, the wires of the bundle may escape from the desired position and possibly come into contact with moving parts of the machine or equipment, or otherwise destroy the value of the installation. If the strap is installed too tightly, the strap may be broken or damaged or the insulation on the wires in the bundle may be crushed or broken, resulting in a possible malfunction of the electrical circuit. Also, it is desirable that the strap be cut off as closely to the connector as possible in order to eliminate any sharp protrusions extending from the end of the strap which might cause injury to workmen or associated equipment (R–308, 605; PX–14, p. 2; PX–76, col. 1, ll. 23 to 32).

The Logan tool was deficient in its method of applying plastic binder straps. Using such a tool, it was not possible to control the tension in the binder straps during installation; tension of the strap was entirely up to the operator's discretion, resulting in improperly applied straps which were not under substantially uniform tension (PX–39, PX–76, col. 1, ll. 46–55; R–441, 448, 449, 454, 459, 462–470, 587, 593, 605, 606, 659–660).

Straps installed by these early tools had a significantly high failure rate and during this early period of time, the plastic binder straps were only used in a very small percentage of their possible applications (R–1033, 1034, 1040, 1041).

The Thomas & Betts Co. had a large staff of engineers skilled in this art (R–1034) who recognized the problem of overtensioning a strap when installed by the Logan tool. The Thomas & Betts Co. did not produce a tension-responsive cut-off tool until mid-1964 (PX–26, PX–40, 43 to 47, PX–76, col. 1, ll. 46 to 55; R–661, 1034 to 1039).

There was a long-felt need for the invention of the patent in suit. The problem in installation of binder straps by other prior art tools was recognized by others skilled in the art at least three years before the time the invention in suit was made, and those others attempted to solve this problem by other means, which were not satisfactory (R–1037 to 1039, 720, 722).

In 1959, the Plaintiff embarked upon a program to introduce a self-clinching strap and a tool for the installation of such straps, which tool would allow installation of the straps under substantially uniform predetermined tension, so as to eliminate the deficiencies theretofore found in the then-available installation tools (R–586, 587, 604 to 607).

In early 1962, after numerous possible designs were considered, the inventors conceived of the tool of the patent in suit, which tool appeared to be capable of tensioning a strap to the predetermined tension and then cutting off that

strap, while the strap about the bundle and the free end of the strap were under tension (R–611 to 615). This tool was introduced in March, 1962, and immediately was accepted by industry.

The subject matter of the patent in suit is a hand tool of small size and simple construction, having incorporated therein a binder strap tensioning mechanism for tightening a binder strap about a bundle, and a cut-off mechanism that operates to sever the free end of the binder strap only in response to achieving a predetermined tension in the binder strap about the bundle (R–64 to 66). The novel and non-obvious feature of the patented tool is the inclusion in a hand tool of actuating and biasing means by which it is possible to obtain tensioning of the strap, a sensing of the tension in the strap, actuation of severing means to obtain cut-off, and cut-off of the strap in an automatic sequence by movement of a single lever in one direction with no operator discretion (R–785).

In using the patented tool, a binder strap is applied about a bundle of wires, the free end of the strap is inserted through the connector and the binder strap is pulled to hand tightness about the bundle. A first jaw of the tool is placed against the connector and the free end of the strap is engaged by a gripper on the second jaw of the tool. The handles of the tool are squeezed together to draw the free end of the binder strap through the connector; several cycles of operation of the tool handles may be required to reach the desired tension in the strap about the bundle, at which time the severing mechanism of the tool is actuated while the binder strap is under tension and in response thereto, and thereafter the severing mechanism of the tool is actuated through a tension-responsive mechanism to cause a blade to sever the free end of the binder strap adjacent to the connector (R–52 to 54).

An adjustment mechanism is provided so that the tension to which the binder strap is drawn by the patented tool can be changed to accommodate different sizes of binder straps (R–92, 93).

The invention is illustrated in the patent in a tool of "plier" configuration. After introduction of the "plier" tool incorporating the tension-responsive cut-off mechanism, the Navy expressed a preference for a "gun"-shaped tool capable of tension-responsive cut-off (R–619, 620, 660, 661).

At a December, 1963 meeting before the Navy Department, Plaintiff's President, Mr. Caveney, was shown a Thomas & Betts tool of gun-shaped configuration which also incorporated therein a tension-responsive mechanism (R–619, 620, 660, 661). There is no evidence that such gun-type tool was known, manufactured, or invented prior to the filing date of the original patent, 3,169,560, upon which the reissue patent was based (R–619, 620, 660, 661; Lawson, et al. Patent No. 3,344,815).

Subsequent to the meeting with the Navy, Plaintiff developed its own gun-type tool which incorporates the basic concept of the patented tool, but has certain improvements, such as the tension-responsive cut-off mechanism so that the tool is not sensitive to the position of the operator's hand on the handle (PX–32; R–584, 622, 623). The plaintiff obtained another patent on the novel features in its gun-type tool (R–618, 622).

Claims 1–3 in suit were in the original patent and were amended in the reissue application; claims 4 and 5 were in the original patent and were not changed in the reissue application; and claims 14 to 16 were added in the reissue application (R–83, 100, 103, 125).

Claim 1 of the Re. 26,492 patent defines the basic structure of the invention in terms of a hand tool 1) having two jaw members mounted to provide relative movement between them; 1a) the first jaw member having means to restrain longitudinal movement of one end of the strap, and 1b) the second jaw member having means for pulling on the other end of the strap, 2) the relative movement in one direction between the

jaw members causing the strap to be longitudinally tensioned therebetween, thus to tighten the binder strap about an associated bundle (R–86 to 88; PX–19); 3) strap-severing means mounted adjacent the first jaw member for strap-severing relative movement therebetween to sever the portion of the strap disposed between the restrained end of the strap and the second jaw member; 4) actuating means for producing the strap-severing relative movement between the strap-severing means and the first jaw member; and 5) bias means permitting activation of the actuating means only when a predetermined tension is reached in the strap, to sever the portion of the strap disposed between the restrained end of the strap and the second jaw member while the strap is under tension (R–88 to 92; PX–19).

Claim 2, dependent upon claim 1, further specifies that the bias means is adjustable to vary the predetermined tension required to be reached in the strap before the strap-severing means is actuated (R–92, 93; PX–19).

Claim 3 includes all of the elements of claim 1 and also calls for jaw operating means for applying force to the jaw members (R–95, 97 to 100; PX–21).

Claims 4 and 5 are original claims and were not changed during the reissue of the original patent. The tool defined in claim 4 and that defined in claim 5 comprises essentially the same elements as claim 1 discussed above, certain of the elements being defined with greater particularity, such as the jaws being mounted for pivotal movement, and, in claim 5, that the actuator for the shear blade is mounted on the second jaw member to pivot with it (R–100 to 114; PX–22, 23).

Claims 14 to 16 were added to the patent during reissue. Representative claim 14 is drawn to a tool having a first jaw member, the jaw member having 1) a strap engaging member for engaging an associated connector strap end during the tightening of the loop about the bundle, 2) a second jaw member having a strap pulling member thereon for pulling on the free strap end during the tightening of the loop about the bundle, 3) drive structure interconnecting the jaw members for moving the jaw members away from each other to pull the free strap end away from the connector strap end to tighten the loop about the bundle and to place under tension the strap including the portion disposed between the engaged connector strap end and the second jaw member, 4) strap-severing means positioned to sever the portion of the free strap end between the engaged connector strap end and the second jaw member, and 5) an actuator for the strap-severing means responsive to the placement of the strap under a predetermined tension for actuating the strap-severing means to sever the free strap end between the engaged connector strap end and the second jaw member (R–126 to 129; PX–29, 30, 31).

In 1966, when considering litigation under the original 3,169,560 patent, the Plaintiff caused a validity search to be conducted (PX–16; R–631). The Harvey 1,989,669 patent was found in this search (R–631; PX–16). As a result of this search, a reissue application was filed, the purpose being to add certain limitations to some of the claims in order to distinguish over the Harvey '669 patent, and to eliminate some of the more limited language in some of the claims in order to broaden their scope, and also to add additional claims (PX–1, ¶ 7; PX–2, pp. 16 to 18).

The reissue application was directed to the same subject matter as the original patent and the only addition to the specification of the original patent was the inclusion of the Abstract of the Disclosure and the insertion of a patent number relating to a previous pending application. The same drawings were used in the reissue application that were used in the original patent (PX–2, PX–4). The claims in issue are directed to the same invention as claimed in the original patent and are fully supported by the disclosure of the original patent.

Claims 4 and 5 in issue are unchanged from the original patent (PX–2; R–100, 103). The Defendants introduced no evidence that the claims were not supported by the original patent or were directed to an invention different from that originally claimed.

The Harvey '669 patent was brought to the attention of the Patent Office by Plaintiff when the reissue application was filed, and that patent was considered and cited by the Patent Office before allowing the claims of the reissue patent (PX–2, pp. 17, 18, 20, 23, 24, 28, 30, 33, 34, 38, 41).

The Harvey '669 patent relates to a machine for installing steel strapping about relatively large bundles; it is not a hand tool (R–514). In Harvey, one end of the metal band is held in a first gripper 7 and 8; the other end of the band passes around the box and through a second gripper 6 and 26 and through a crimping mechanism 50, then below a shearing blade 161 into a third gripper 36. By operating the handle 71 which is connected through the spur gear 98, the gripper 36 is caused to move outwardly to tension the band about the box. When a predetermined tension has been reached in the band about the box, further tensioning of the strap is terminated by means of the tension-responsive mechanism (Harvey '669, p. 9, right-hand col., ll. 9 to 58). When the tensioning mechanism trips, continued operation of the handle causes the crimping mechanism to secure the band together (Harvey '669, p. 9, right-hand col., ll. 59 to 68). Integral with the spur gear 98 is a severing cam 164 which is operatively coupled to the shearing blade 161. Continued operation of the handle 71 after crimping actuates the shearing blade to sever the excess material of the band (Harvey '669, p. 8, right-hand col., ll. 54 to 69).

During prosecution of the reissue application, the Examiner rejected only claims 1 to 4 and 14 as being met by the Harvey '669 patent (PX–2, p. 22, last ¶). In reply to this rejection, and in the reissue oath, a number of reasons were advanced as to why those claims and others distinguished from the Harvey '669 patent (PX–2, pp. 17, 30 to 34, 38). One of the reasons advanced, namely, the location of where the strap is severed relative to the jaws, was in error (R–427). This erroneous statement is not of any material consequence in distinguishing the claims from the Harvey patent. In Harvey '669, the severing of the band has nothing to do with the tension in the band, as the band is crimped before severing occurs.

The file wrapper of the patent in suit discloses that the Examiner cited the following patents (PX–2, p. 41):

| | |
|---|---|
| 1,939,669 | Harvey |
| 1,463,869 | Campbell |
| 1,499,096 | Campbell |
| 2,569,623 | Wognum |
| 2,967,550 | Rosenberger, et al. |

The Defendants cited the following patents as prior art (PX–1, ¶19):

| | |
|---|---|
| 1,304,620 | Steinkoenig |
| 1,650,844 | McChesney |
| 1,669,048 | Gerrard, et al. |
| 1,789,900 | Harvey |
| 2,882,934 | Gerrard |
| 3,047,945 | Logan |
| 3,344,815 | Lawson, et al. |

At trial, Defendants also relied upon the early Thomas & Betts tools (PX–39, 40; DX–26) as prior art, which tools are illustrated in the Logan 3,047,945 patent and the drawings identified as PX–43 to 47 (R–558 to 560, 581, 587, 819, 892, 893, 897 to 902, 905, 906).

The Defendants contend that the Gerrard '048 and Harvey '900 patents are more pertinent prior art than the Harvey '669 patent, because those patents have tension-responsive mechanisms for cutting off the strap in response to a predetermined tension (R–372, 383, 417, 418). No evidence was introduced by the Defendants as to why the tension-responsive mechanism of Gerrard '048 is any more pertinent than the tension-responsive mechanism found in the Harvey '669 patent considered by the Examiner.

The preponderance of the evidence, including working models and testimony of expert witnesses, establishes that the two embodiments illustrated in the Harvey '900 patent would be inoperable to tension plastic binder straps to a predetermined tension and sever those straps at such tension while under tension (R–730 to 735, 739 to 743). The embodiment illustrated in Figs. 5 and 6 of Harvey '900 is substantially identical to the tension-responsive mechanism illustrated in Harvey '669; however, certain changes were made in the Harvey '669 device which render it operative (R–515, 516, 774). Harvey '669 includes a complicated mode shifting mechanism having cams, levers and gears and requires gear shifting after tripping of the tensioning mechanism to activate the crimping means and then, through the gear and cam arrangement, to activate the cutter (R–1014).

The preponderance of the evidence establishes that the tension-responsive mechanism of the Harvey '669 patent is the most pertinent prior art (R–771 to 774, 1010 to 1012; PX–81, 82).

The claims in issue distinguish over the Logan patent because the tool of the Logan patent does not include gripping means on one of the jaw members; it does not include an actuator or actuating means for the knife as the phrase is used in the patent in suit, and does not include biasing means which prevent actuation of the knife until a predetermined tension has been reached in the strap (R–381, 382, 447 to 474, 776, 777, 780, 781, 782, 783).

The claims in issue distinguish over the Harvey '900 patent because that patent is not a hand tool and it does not include actuating means and biasing means as those terms are used in the claims in issue (R–778, 779, 781, 783, 784, 929 to 939, 944 to 950, 967 to 972).

There is no single prior art patent which meets all of the limitations of the claims in issue of the Re. 26,492 patent. None of the patents cited discloses a hand tool which includes actuating means for causing operation of the strap-severing means and bias means permitting activation of the actuating means only when the predetermined tension is reached in the strap about the bundle.

The Gerrard '048, Gerrard '934, Logan '945 and Harvey '900 patents originally were classified in classes 140–93, 140–93.2, 30–134 and 149–93, respectively (R–753 to 755). Logan and Gerrard '048 were later reclassified in class 140–93.6 (R–755, 756). There is no evidence that these original patents were ever officially classified in any other class and subclass during the period of March, 1962 through November, 1968 (R–756 to 765) when the original and reissue applications were before the Patent Office. Those classes were searched by the Examiner (PX–2, p. 72), whereby the Examiner considered and discarded the additional prior art cited by the Defendants.

No testimony was offered as to how the Logan '945 and Harvey '900 structures could be combined in any manner so as to anticipate or render obvious the patented invention; no testimony was offered as to how the prior art patents of Gerrard '934, Gerrard '048, Steinkoenig and McChesney could be combined in any manner which would be obvious to one of ordinary skill in the art so as to anticipate or render obvious the patented invention; nor would it be obvious to a person of ordinary skill in the art to combine structures of the various prior art patents in a manner which would provide the structure of the patented tool as set forth in the claims in suit.

The combination set forth in claims 1 through 5 and 14 through 16 of the Re. 26,492 patent would not have been obvious to a person having ordinary skill in the binder strap tool art in 1962, when the invention defined in the claims of the patent was made, and these claims define a new combination of elements which co-operate together to produce new, different and unobvious results over the prior art.

The Defendants began to develop a tool to compete with the Plaintiff's gun-type tool in late 1967 and early 1968 (PX–11, 12, 13, 14). The Defendants felt it essential that this tool incorporate an automatic tension cut-off device because large users of the binder straps insisted on a tool which automatically tensioned the strap to a predetermined level and then cut the extending tail (PX–13, p. 3; PX–14, p. 2, ¶ 3).

Prior to development of the accused tools, the Defendants had in their possession and had inspected Plaintiff's "plier" tool and gun tool, on which tools the original patent number 3,169,560 appeared (PX–1, ¶ 8; R–341, 342, 345, 346).

In use of the accused tools, the nose of the tool is placed against the binder strap connector and the free end of the binder strap is engaged by a movable gripper on the tool. Manual squeezing of the handles toward each other causes the binder strap to be progressively tightened until a predetermined tension in the binder strap is achieved (R–69–72, 80, 81). Thereafter a bias structure is overcome, allowing the roller-actuator to engage a strap-severing member and cause it to sever the free strap end adjacent to the strap connector (R–72, 81, 82).

Both of the accused tools operate in the same manner (PX–1, ¶ 11), except the Model TY120–1 does not have the face plate on the nose of the tool which appears on the Model TY50–1 (PX–1, ¶ 11; R–94).

The Defendants' Models TY50–1 and TY120–1 are of a gun configuration. Each of those tools includes a body portion having a forwardly extending first jaw member on which there is provided an abutment which restrains the connector end of the associated strap (R–69 to 74, 94). In the Defendants' Model TY50–1 this abutment is in the form of a separate face plate affixed to the jaw member (R–74) while in the Defendants' Model TY120–1 this abutment is provided by a turned-over portion of the first jaw member in the same fashion that a turned-over portion of the first jaw member in the same fashion that a turned-over portion of the jaw member provides the restraining means in the tool illustrated in the Re. 26,492 patent (R–94, 806, 807).

The accused tools have the following structural features which perform the indicated function:

a) Two jaw members in the form of an extended portion of the body and a handle, which jaw members are pivotally connected to provide relative movement between them (R–72, 73, 76).

b) The first jaw member has means to restrain longitudinal movement of one end of the associated strap (R–74, 94).

c) The second jaw member has means for pulling on the other end of the associated strap; the means comprising a gripper affixed to the draw bar which in turn is connected to the second jaw member. The draw bar performs no function other than as a link between these two parts. The relative movement between the jaw members causes the strap to be longitudinally tensioned therebetween (R–76).

d) Strap-severing means in the form of a member pivotally mounted on and adjacent the first jaw member and having a blade at one end for severing the strap and a cam surface at the other end for engagement with an associated actuator, the strap-severing means being mounted on the first jaw member and adjacent thereto for strap-severing movement relative thereto to sever the portion of the strap disposed between the restrained end of the strap and the second jaw member (R–74).

e) Actuating means in the form of a roller, which actuating means produces the strap-severing movement between the strap-severing

means and the first jaw member when the actuating means is operated (R–78).

f) Bias means in the form of a spring which permits activation of the actuating means only when a predetermined tension is reached in the strap (R–77).

g) The bias means in the accused tool also is adjustable to vary the amount of the desired predetermined tension in the strap before the strap-severing means is actuated (R–78).

Tensioning, activation of the actuator, and severing, in both the patented tool and the accused tools, is accomplished by the pivot point of the second jaw member shifting from a location during tensioning which is spaced from the pass line of the strap through the connector, to a location substantially at the pass line of the strap through the connector to overcome the bias at the predetermined tension, and back toward the original location during severing (R–482 to 490, 693 to 695, 714 to 717).

Claims 1 through 5 and 14 through 16 literally read on these features of the accused tool (R–82 to 95, 97 to 114, 123 to 134, 138 to 158).

There is no file wrapper estoppel which would preclude the Plaintiff from construing the claims in issue on a pistolgrip tool. The file history of the patent in suit indicates that the Examiner considered the phrase "jaw members" very broadly when rejecting the claims on the Harvey '669 patent (PX–2, pp. 23, 24). The Harvey '669 patent is not a plier tool, and no argument was made in the reissue application that the claims were limited to a plier-type configuration in order to distinguish the claims from the Harvey '669 patent. The "jaw members" are defined in the patent only as members "which carry the mechanism for causing the strap to be tensioned and cut off." (PX–4, Col. 2, ll. 60 to 63). This is the same function performed by the handle and body portion of the accused tools (R–72 to 79,

144 to 149). A "jaw" is defined in Chamber's Technical Dictionary as "one of a pair of members between which an object is held   .   .   ." (R–146, 817).

There was no acquiescence by the patentees in the Examiner's statement that the claims copied from the Lawson patent for interference purposes were not supported by the disclosure of the reissue application (PX–2, pp. 60 to 67). The Examiner's comments were not related to limitations in any of the claims of the patent in suit, but were directed only to claims copied from an entirely different patent. The file history of the Lawson patent also indicates that those copied claims were allowed only after limitations were inserted therein to distinguish those claims from the original Patent 3,169,560 (PX–5A, pp. 13 to 23).

Although there are slight differences in the motions of the corresponding parts between the tool illustrated in the patent in suit and the accused tools, resulting from the specific differences in configuration of the actuator, namely, a rack-and-gear arrangement in the tool illustrated in the patent as compared to the roller-ramp arrangement in the accused tools, and the pivotal knife in the accused tool as compared to essentially a "sliding" knife in the patented tool, the claims in suit literally read on the accused tools and the accused tools are the full functional equivalent of the tools specified in claims 1 through 5 and 14 through 16 (R–154).

Test data and theoretical analyses by both Plaintiff and Defendants' employees indicate that both tools will tension a binder strap to a substantially uniform predetermined tension and thereafter cut off the extending tail of the binder strap while the strap is under tension (R–155, 171, 172, 228, 229, 262, 328, 329, 692, 869 to 872). Although there is some variation in tension among the straps applied by both the tool of the patent in suit and the accused tools, this variation is of substantially the same magnitude in both the patented tool and the accused tools, and is rela-

tively nominal compared to the complete inability to control tension, other than by operator discretion, in the binder strap tools of the prior art (R–155, 171, 172, 228, 229, 262, 269). Plaintiff's test evidence clearly establishes that the patented tool and the accused tools will tension binder straps to substantially uniform predetermined tensions and that the tension settings are adjustable (PX–26).

The actuating means called for in the claims in suit is not limited to the gear-and-rack arrangement illustrated in the patent. The language of these claims is broader than other claims not involved in this litigation, such as claims 6 and 9, which do specify that the shear blade and actuator have teeth which engage each other, the teeth causing the movement of the shear blade upon movement of the actuator.

The patent in suit is a pioneer patent. The tool of this patent was the first hand tool for applying plastic binder straps to incorporate a tension-responsive mechanism for automatically initiating cut-off at a predetermined tension, and this feature is considered essential in binder strap tools used in this industry (R–342–345, 656–657; PX–14, p. 2).

The claims in issue read on Plaintiff's plier tool as well as the gun-type tool subsequently manufactured by Plaintiff (PX–64; R–156 to 158). It is the feature of automatic cut-off at predetermined tension in a hand tool which is the novel and highly successful feature of the patented tool, and tools incorporating such feature have been highly successful commercially and have received wide acceptance in the field. Since introduction of the original plier-type tool and subsequent introduction of Plaintiff's gun-type tool and through 1971, Plaintiff had sold over one hundred thirty thousand (130,000) tools covered by the claims of the patent in suit (PX–37). Large users of binder straps will only accept tools which incorporate an automatic cut-off at predetermined tension feature (PX–14, p. 2, ¶ 2, ¶ 3, R–342 to 345).

This Court has jurisdiction of the parties hereto and of the subject matter of this litigation, 28 U.S.C. Section 1338, and venue is properly laid in this district as to the Defendants, Burndy Corporation and Burndy Midwest, Inc.

█ █ A patent and each claim thereof shall be presumed valid, and the burden of establishing invalidity of a patent or any claim thereof rests upon the party asserting it, 35 U.S.C. Section 282.

█ █ The party asserting invalidity has the burden of establishing invalidity by clear and convincing evidence, and every reasonable doubt as to the validity of the patent should be resolved against the party challenging validity.

█ The statutory presumption of validity applies to reissue patents with the same force as it applies to original patents.

None of the prior art offered in evidence identically discloses or describes the invention as claimed in U.S. Patent No. Re. 26,492 in accordance with the requirements set forth under 35 U.S.C. Section 102.

█ The presumption of patent validity is strengthened where the most pertinent prior art was before the Patent Examiner during the prosecution of the patent application.

█ It is presumed that the Examiner considered and discarded uncited patent references which are classified in the class and sub-classes in which the patent in suit issued, or in a class and sub-class which has otherwise been indicated as having been searched by the Examiner.

█ Where there has been a long-standing need for a solution to overcome defects in the prior art, the answer to the problem as solved by the patentee of the patent was not obvious to those skilled in the art.

When evidence shows that others in the art attempted to solve the same problem and failed in their efforts and

did not arrive at the solution claimed by the patent in suit, the statutory presumption of validity is substantially strengthened.

A need in the marketplace for a patented product coupled with the commercial success of that patented product, while not decisive in determining the question of validity, are objective factors showing unobviousness and materially strengthen the presumption of the validity of the patent.

The claims in suit are entitled to the filing date of the original patent, March 8, 1962, and the Lawson patent No. 3,344,815 is not prior art usable against such claims.

The inquiry into patentability must be directed toward the subject matter as a whole and not to the elements of the claimed combination and their individual novelty, and therefore a patented combination which results in a more facile, economical or efficient unit, or which provides results unachieved by prior art structures, cannot be anticipated piecemeal by a showing that the various elements of the invention are individually old.

The difference between the subject matter set forth in the Re. 26,492 patent and the subject matter of the cited prior art references as a whole would not have been obvious at the time the invention was made to a person of ordinary skill in the art to which such subject matter pertains, under 35 U.S.C. Section 103.

The Re. 26,492 patent in suit and the claims 1 to 5 and 14 to 16 thereof are valid.

Patent claims are to be construed liberally, particularly when the patented invention has had significant commercial success or the patent is of the pioneer type.

Patents are not limited to the embodiment of the invention described in the specification and drawings since the patent claims measure the invention. If the accused device achieves substantially the same results in substantially the same way as the patented device, the devices are the same in the eyes of the patent law.

One appropriating the principle and mode of operation of a patented device, and obtaining its results by the same or equivalent means, may not avoid infringement by making a device different in form, even though it be more or less efficient than the patented device.

In determining equivalency, consideration must be given to the purpose for each element as used in the patent, the qualities of each element when combined with the other elements, and the function which the element is intended to perform.

Infringement is not avoided by making into two pieces what a claim specifies as one, provided that the two pieces perform the function of the one in the same way.

The addition of an added element to a combination called for by a patent does not avoid infringement of the patent.

Narrow limitations in some claims are not to be read into broader claims.

Claims 1 through 5 and 14 through 16 read literally on the accused binder strap tools manufactured by the Defendants, and the Defendants, by their manufacture and sale of such tools, have infringed such claims.

The accused binder strap tools are the structural and functional equivalent of Plaintiff's patented binder strap tool and accomplish substantially the same result in substantially the same way as the binder strap tool set forth in claims 1 through 5 and 14 through 16 in suit. The Defendants, by their manufacture and sale of binder strap tools that are the equivalent of the tool set forth in the claims in issue, have infringed those claims of the patent.

Plaintiff is entitled to an injunction against further infringement of Patent Re. 26,492, to an accounting for the

damages sustained by reason of such infringement not less than a reasonable royalty, to a judgment on the damages so determined and execution on such judgment. The questions of increasing of damages under Title 35 U.S.C. Section 283, the amount and period of interest and attorney's fees pursuant to Title 35 U.S.C. Section 285 are hereby specifically reserved until the accounting period.

Wherefore, Defendants Burndy Corporation and Burndy Midwest, Inc. are enjoined from further infringing Patent Re. 26,492, and are ordered to account to the Plaintiff for infringing products sold, and are entitled to damages not less than a reasonable royalty.